Our first case this morning is 24-2345, Amsted Rail Company, v. Squires, Mr. Miller, whenever you're ready. I'll reserve a few minutes. Please proceed. Thank you. May it please the Court. This case is a consolidated case involving two IPRs before the Patent Trial and Appeal Board. I would like to start by addressing some issues in relation to the 673 patent, which is the underlying 539 case. Can I just ask you before you dive into it, there's at least, I think by my count, at least 10 issues here. I assume you'll focus on the stronger ones, but just give me a preview. What are the strongest issues among the ones that you've briefed? Sure, Your Honor. The first I'm going to address is motivation to combine the embodiments of what that... That's on the 673? Yes, that's correct. Limitation 5K, 5G, maybe? That is the 223 patent. I'll get to that in a second. I'm also going to address the claim construction issue with relation to nominal operating conditions and severity level in relation to the 673 patent. For the 223 patent, I will address claim 5 with regard to an assumption that the Board made that we believe is unsupported by the record. That would be the focus of our argument. I'll start with the motivation to combine issue. There's no dispute below that the petition is based on a combination of embodiments, separate embodiments in the FEV. The petition states that... How do you know that? I mean, it could be easily read that the petition said Lefebvre 102 or in the alternative 103, and the Board adopted the petition. What is it that the petition said in that reference? I'm just going to call it Lefebvre. That shows you and shows us that the different limitations that are disclosed in Lefebvre are necessarily in different embodiments of Lefebvre. That is what the petitioner said, and again, that was adopted by the Board. Well, the petition said a couple of things, right? It said, we're relying on 102. The reference Lefebvre doesn't expressly disclose that all these different limitations are contained in a single embodiment, but nevertheless, it's also in the alternative that would have been obvious under 103. Am I misunderstanding that? I did not read the petition as proposing arguments in the alternative. In the petition... What page are you on? It's short. This is Appendix 1681. The petitioner says Lefebvre, however, does not expressly state all the disclosed limitations are part of a single embodiment. What does the sentence say above that? What it says is that petitioner believes these claims are anticipated. However, the ground that's actually presented is a 103 ground. They did not present a 102 ground. Well, the thing is, we've seen this before, where the Board officially finds claims unpatentable under Section 103, but we've also affirmed those when the single reference contains all the limitations in a 102 sense. That's not necessarily surprising to us. The next question is, your argument is premised on there's something in Lefebvre that's telling us that the limitations that are being relied upon in that reference are being disclosed in separate embodiments. My question to you is, when I read Lefebvre, that wasn't so obvious to me. What is it that proves to you and me that the parts of Lefebvre that the Board and petitioner are relying on are coming from different embodiments in Lefebvre? I think my response to that is that it's not Amstead's burden to provide the prima facie case-in-chief. The motivation to combine, whether it's through separate references or through multiple embodiments, in the same reference, and this is from the Stefan case. I guess the question is, why couldn't it be that the Board affirmed both? Affirmed, yes, this is a 102, because Lefebvre teaches all these limitations, and also, in the alternative it's a 103. That record was not developed below. The entire record in the IPR was as a single-reference obviousness ground. There was no development about whether they were all in a single embodiment or not. That's kind of our point, is that that was never developed. They did not present it in their petition that way, and that was not part of any of the briefing below. The Board acknowledged directly that Lefebvre doesn't disclose all the limitations in a single embodiment. The Board said that? Yes, in the 673, yes, they did. That's in the Final Written Decision Appendix, page 156. So the petitioner asserts that the challenge claims are unpatentable under 103 over Lefebvre, which does not disclose expressly all the limitations as part of a single embodiment. So that's what the Board found. That's a finding of the Board at that point. But I guess if they're not expressly all disclosed in a single embodiment, that doesn't mean they're not disclosed all in a single embodiment. Again, that's not Amstead's burden to show. It is the petitioner's burden to show that either all of the limitations are in a single embodiment, which both the petitioner and the Board acknowledge they are not, or to show motivation to combine those separate embodiments. Amstead is not required to show a lack of a prima facie case. So what you're isolating as being the problem in this regard is simply that because the petition failed to make a prima facie case of motivation to combine in the petition? That's correct. Part of a prima facie case of obviousness is providing a motivation to combine a reasonable likelihood of success. And that was never developed for this round. When did this come up in the proceeding? Did you challenge it in the response? Yes, Your Honor. They came back and said? The response of the petitioner was, we don't have to, citing to real-time data. The problem with real-time data is that that was expressly a 102 or in the alternative 103 ground, and there was an express finding that all of the limitations were in a single embodiment. And the Board in that case actually did address motivation to combine in the alternative argument. So what are you seeking here? A vacate and remand? Or are you saying the petitioner forfeited its ability to establish a motivation to combine now because they didn't have it in the petition? I think it's the latter. The petition does not state a prima facie case, and it's too late now to add to that record. At the minimum, there should be a vacature and an additional fact-finding. So with regard to claim construction of the 673 patent, I'm going to just touch very briefly on nominal operating conditions because I do not think there was a very big dispute. The main dispute just had to do with how the Board approached the addition of normative into the construction. Just so we are clear, the Board construed nominal operating conditions as normative or expected conditions based on certain things that aren't relevant here. And Amstead proposed simply just expected conditions. And the reason why was that both petitioner and the Board in its final decision continually referred to operational limits as normative limits. And frankly, that just didn't make a lot of sense because nominal operating conditions, as it is used certainly in the claim, has to do with what operating a critical failure or an operational limit cannot be, by definition, a nominal operating condition. The only thing you dispute is the inclusion of the word normative at the beginning of the construction. And what is it that you think specifically is being captured by that inclusion of the word normative that otherwise would not be within the scope of this claim term? Well, again, judging from the description that the Board uses, they refer to operational limits of the rail car as normative limits. And so to the extent that is included within nominal operating conditions, our view is that it cannot be corrected. Your view is that operational limits would not be included within, quote, expected conditions? That's correct. Expected conditions are what the rail car would be going under normal conditions under normal operation. An operational limit is where you have, just to use a specific example, you have a bearing that is vibrating to the point where it is at the operational limit of that bearing and it's at risk of failure. That's not a nominal operating condition. Well, the Board here relied on the specification, 1, 42, or 48. That's what I think they cited. Are you familiar with what I'm talking about? I believe so. Why is that passage not sufficient basis for supporting enforcement? I apologize. What was the citation? I've got it here in my notes. 1, 42 to 48. Well, for one thing, this paragraph is talking about mechanical failures that can very quickly lead to catastrophic failure. What I'll say is, so one thing I'll say, I'll say this right now, if the Board had described their analysis the way that Intervenor did, I don't know if we would be here talking about this, but that's not what they said. They repeatedly referred to a limit or maximum permissible operating temperatures, for example. Again, I don't want to belabor this point. The reason why this is important is, I think, going to the next issue, which is the severity levels. Do you want to move to those quickly? Yes. Absolutely, Your Honor. So the AMSA's construction of severity level was that it's one of a plurality of known levels indicating seriousness of a condition or a deviation. This is related to the construction of the claim itself. The severity level is assigned to deviations, which are, in the previous element, defined as deviations from nominal operating conditions. So that's, again, why an operational limit would not be a nominal operating condition. Operational limit would be, presumably, one of those points that might indicate a severity level. But in any case, the Board construed a severity level as a type of fault which requires a particular action. AMSA said, and it's an expert developed below, that there's no definition of level that equates to a fault. It didn't make a lot of sense to refer to it as a type of fault. I believe the reason why this is the case is that both parties looked at the disclosure of the tiered alarms in the patent. That would be column 13 to column 14. Can I just ask you quickly before your time runs out? What are the consequences of the two claim construction points you've just raised here? Yes. Properly construed, the FAB does not disclose severity levels. The FAB discloses a single threshold. What about the normative, the first claim construction? Again, I think the import there is that the severity levels are assigned to the deviations from nominal operating conditions. Again, nominal operating conditions are expected conditions from our view. Even if you're talking about normative conditions, as long as it's normative to normal operating conditions, then I guess that could be fine. But again, as far as the severity level is concerned, the issue is the FAB does not disclose the severity level as it's described in the patent and as it's claimed. All right. We're running out of time, so we'll take the other issues that you wanted to raise on the briefs and see it from the other side. Thank you. Thank you, Your Honor. Good morning. Good morning, Your Honors. May it please the Court. I'd like to start with the motivation to combine issue, if that's okay. I just want to begin by saying there was a lot of statements here made about what the Board agreed to or what the petitioner alleged. I want to go back to where Judge Chen was talking about in the petition how what was stated there wasn't some concession that there are disclosures and multiple embodiments. But what the petitioner was saying is that everything is disclosed in the Lefebvre reference However, it's not expressly clear that there's anything in multiple embodiments. The petitioner did not point to there being multiple embodiments where the disclosures are. Amstead did not point to multiple embodiments. And the Board, in its finding, did not agree and point to the disclosures being in multiple embodiments. That page that counsel pointed to where the Board made the statement, the Board is quoting the petitioner. The Board is saying, go back to it again, it was on APPX 156 where opposing counsel seemed to suggest that the Board made some sort of admission that things are in different embodiments. But what it's saying is petitioner asserts that claims, and it lists the claims, are unpatentable under 103 over Lefebvre, which does not expressly, I'm it's just quoting what the petitioner had said. It's not making some sort of... The petition controls what happens in the proceeding. Can the Board find a claim unpatentable as anticipated if the petition does not argue that it is? So to answer your question, no, but that's not exactly the facts here. So the petition says that everything, all the limitations are found in Lefebvre. And then it says we're not clear that everything's expressly in one embodiment, so we're doing it under a 103. This is just like real time, despite what opposing counsel said. In that case, it was a 103, and the Court there said, okay, this is really like a 102, and we don't need this epitome of obviousness. We can find that all of the limitations are here without looking for a motivation to combine. And that's exactly what happened here. When the patent owner filed this corrected reply, it basically said, there's an issue here because there's a limitation missing. It did not really argue motivation to combine, but it said, there needs to be a motivation to combine here because there's something missing, and so you have to modify the reference in some sort of way. And that's not what the Board found. The Board went through every single limitation and said, here's the limitation in the reference. Here's the limitation in the reference. There's no reason to modify here. There's no reason to find a motivation because everything, all the limitations are disclosed in that particular reference. So this is a case akin to real time that can stand the way that it was written. Moving on, if that's okay, to the claim construction with the normative operating conditions. If you could address, your friend said, I'm not sure whether this is normative or severe. He made the point that if what you're saying in the brief had been like the Board said, that might have been okay, but it was different, what you're saying. So if you know what he's speaking to, why don't you address that? I don't because I feel like I was just defending what the Board actually did, which was essentially finding that the Board, I think what Amstead is arguing is that they feel that the stage four critical alarm was read into the claim, but that's not actually what happened. That was my impression when I read their brief, and I think that's the argument that is being made here today, that you need some, you can't read that in, but the Board did not do that. It didn't find that that failure was a catastrophic failure. It was basically saying what's happening here is that there are multiple operational norms that serve as reference points for detecting the deviations, and it literally went through and said you have bearing temperatures that exceed the temperature of an absomate, you have average bearing temperatures calculated at the wagon or freight level, you have threshold-based alarm values for bearing temperatures, and all it's doing is saying under this word nominal operating conditions, it's saying you have these deviations that come from what is normal, and that's what that normative or expected condition language means. It's not saying we're bringing in a fault or something where it's so high that it's wrong. We're just saying this is what it should be at a certain level, something is different, and so it is off of the normative operating conditions. So, I'm sorry, in your view then, what is the word normative adding to the construction of nominal that wouldn't be covered if normative was not in the construction? I think it's just showing that there are operational norms, operational values that are what one would expect when operating the rail car. Is it just redundant of expected conditions, or is it actually broadening the claim term? That is the inclusion of the word normative. I think it could be made that it might be a little bit redundant because it's saying normative or expected, but I think the reason it's stated here is because there are these sort of predetermined values, meaning predetermined conditions within, let's say, the bearing temperatures that are being looked for, and when the sensors determine that something is wrong there, they send a signal. You mean like if there was some default range that the bearing temperature should be? Like, for example, 100 to 150 degrees Fahrenheit, that would be a normative nominal operating condition? If that's what the reference says. The reference doesn't actually have temperatures. I bet I'm just trying to get a better understanding of what a normative operating condition is. Yes, if that was the expected thing that a rail car operator would have looked for or expected when they were operating the rail car, and then there was some sort of deviation from that, then under that hypothetical... I thought maybe expected might have been referencing some kind of real-time expected temperature in the sense that maybe you're sensing the temperature of all the bearings of a train car, and those are all in roughly the same temperature, but now this one is, for this one particular bearing, the temperature is deviating quite a bit from the other... Yes, maybe I misunderstood your... The expected temperature would be something very close to all the other ones. Yes, and I apologize. Maybe I misunderstood your original hypothetical, but that's what I thought I was agreeing to, but it is absolutely the case of... So that's a real-time expected condition, whereas a normative is, hey, during operation, we expect all these things to be roughly... Yes, within a range of... degrees temperature, and if you're outside of that, then you're not within a nominal operating condition. Right, and then you would have the alarm threshold at that point. Does normative appear in the spec, the word normative? In their specification. I don't recall, Your Honor. Let me just take a listen real quick. And also, is this the plane construction that the other side, that the petitioner was advocating, or is this something the board came up with? This was what the petitioner was advocating, Your Honor. To answer your question about is normative in this... Is nominal operating conditions in the spec. It's a better question. You're welcome. Thank you, Your Honor. To the extent it is, I want to be able to point you... So I'm not sure about the normative, or at least where I could point, Your Honors, to locate that. I'm happy to... I know there's words like normal in there. Yes, those are in there. You're right, not nominal. Okay. Yeah, I don't see that in the specification, Your Honor. So just to clarify. So the plane construction that the board came to is the proper construction and is correct. As for severity level, I think it suffers from sort of the same problem, right? So opposing counsel argued that there's no value, there's no known values in the construction. And I think what they're looking for is the stages one through four that are sort of outlined in their specification. But that's not... The board correctly found that nothing in the specification identifies numeric thresholds defining those particular stages. And so those aren't needed for severity level. The only thing you need for the severity level is the fact that it's outside of this range, and therefore something is wrong with the rail car, and then an action needs to be taken by the operator as a result. There's not any known values anywhere in the specification to point to that would go against the plane construction that the board came up with. And so if there are no further questions, I yield my time. Thank you. Thank you, Your Honors. Thank you, Your Honor. I'm just going to touch briefly on the last point that was raised with regard to the severity levels. The stage, the multi-stage levels that my colleague was discussing are on column 13 of the... Well, I'm looking at the 223 patent, but the specifications are the same. This is appendix 136. And column 13, it has stage 1, stage 2, stage 3, and stage 4, going from lines 5 to lines 43, it looks like. What is discussed here are, in fact, numerical values. They just don't have specific numerical values attached to them. But it's a predetermined amount hotter than the axle mate is 1. That's a temperature. That's going to be a value. And it's predetermined. It's expressly stated as predetermined. For stage 3, it's a temperature of predetermined amount above ambient. Again, that's going to be a value. So that is what we're talking about. And these are actually escalating values that lead to greater seriousness and lead to more necessary interventions. The last one being the critical alarm, which is stop the train and remove the bearing. So this is what Amsted cited to in support of its construction. The board cited to it for its construction. We believe our interpretation of that disclosure is correct and supports the construction. And I'll yield back. Thank you. Thank you. Thank you. Both sides. The case is submitted.